UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CIVIL ACTION NO. 6:22-CV-00095-REW-EBA

PHI HEALTH, LLC, *et al.*,                                                                                 PLAINTIFFS,

V.                                                                     **ORDER**

UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES, *et al.*,                                  DEFENDANTS.

\*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendants' Motion to Transfer Venue and Motion for Extension of Time to file an Answer to the Plaintiffs' Complaint. [R. 21 & 22]. The District Judge referred the Motion to Transfer Venue to the undersigned for an appropriate ruling. [R. 24]. The pending motions have been fully briefed and are ripe for review.

**I. BACKGROUND**

On April 29, 2022, Plaintiffs PHI Health, LLC ("PHI") and EMpact Midwest, LLC ("EMpact") (collectively, the Plaintiffs) initiated this action, challenging two interim final rules issued to implement the No Surprises Act, 116 P.L. 260, 134 Stat. 1182 ("NSA" or "the Act"): *Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36,872 (July 13, 2021) ("IFR Part I") and *Requirements Related to Surprise Billing; Part II,* 86 Fed. Reg. 55,980 (Oct. 7, 2021) ("IFR Part II"). PHI is a provider of air ambulance services and operates two airbases in Somerset, Kentucky and London, Kentucky. [R. 1 at pg. 8]. EMpact provides professional emergency medical services at four hospitals located in the Eastern District of Kentucky. [*Id.*]. The regulations Plaintiffs challenge were promulgated by U.S. Department of Health and Human

Services, the U.S. Department of Labor, the U.S. Department of the Treasury, the U.S. Office of Personnel Management (the "Departments"), and the current leaders of those Departments in their official capacities (the "Department Officials") (collectively, the Defendants).

### A. No Surprises Act

On December 27, 2020, Congress enacted NSA as part of the Consolidated Appropriations Act of 2021. The Act went into effect on January 1, 2021. The background for the Act, as described by IFR Part I, was explained as follows:

> Most group health plans, and health insurance issuers offering group or individual health insurance coverage, have a network of providers and health care facilities [("in-network providers")] who agree by contract to accept a specific amount for their services. By contrast, providers and facilities that are not part of a plan or issuer's network [("out-of-network providers")] usually charge higher amounts than the contracted rates that plans and issuers have negotiated with [in-network] providers and facilities. When a participant, beneficiary, or enrollee receives care from a[n] [out-of-network] provider, the individual's plan or issuer may decline to pay for the service or may pay an amount that is lower than the provider's billed charges, and may subject the individual to greater cost-sharing requirements than would have been charged had the services been furnished by a [in-network] provider. Prior to the No Surprises Act, the [out-of-network] provider could generally balance bill the individual for the difference between the provider's billed charges and the sum of the amount paid by the plan or issuer and the cost sharing paid by the individual, unless otherwise prohibited by state law.
>
> A balance bill may come as a surprise for the individual. A surprise medical bill is an unexpected bill from a health care provider or facility that occurs when a covered person receives medical services from a provider or facility that, usually unknown to the participant, beneficiary, or enrollee, is a[n] [out-of-network] provider or facility with respect to the individual's coverage. Surprise billing occurs both for emergency and non-emergency care. In an emergency, a person usually goes (or is taken by emergency transport) to a nearby emergency department. Even if they go to a[n] [in-network] hospital or facility for emergency care, they may receive care from [out-of-network] providers working at that facility. For non-emergency care, a person may choose a[n] [in-network] facility (and possibly even a[n] [in-network] provider), but not know that at least one provider involved in their care (for example, an anesthesiologist or radiologist) is a[n] [out-of-network] provider. In either circumstance, the person might not be in a position to choose the provider, or to ensure that the provider is a[n] [in-network] provider. Therefore, in addition to a bill for their cost-sharing amount, which tends to be higher for out-of-network services, the person might receive a balance bill from the [out-of-network] provider or facility. This scenario also plays out frequently for air ambulance services, where individuals generally do not have the

> ability to select a provider of air ambulance services, and, therefore, have little or no control over whether the provider is in-network with their plan or coverage.

*Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36872, 36874 (July 13, 2021).

To further the NSA's goals to eliminate surprises to patients who receive a surprise bill, the Act promulgated schemes which apply to health insurance plans and groups, and health care entities that provide emergency services. The sections governing emergency health service providers of air ambulance services are almost identical. The Act, first, requires a health insurance plan or group to cover emergency services (1) without the need for prior authorization; (2) and "whether the health care provider furnishing such services is a participating provider or a participating emergency facility[.]" 42 U.S.C. § 300gg-111(a)(1)(A)–(B). Second, the Act prohibits out-of-network providers from balance billing patients for emergency services and non-emergency services. § 300gg-131(a)(1). Third, the Act implemented a procedure for insurers and out-of-network providers to resolve disputes regarding the payment amount for services covered by the act. Under the Act, insurers and out-of-network providers must resolve disputed charges in the following manner:

> 1. If the service is rendered in a state that has a law which sets the amount for payment of a service rendered by a out-of-network provider, the insurer must make the payment in that amount. *Id.* § 300gg-111(a)(3)(K).
>
> 2. If the state in which the service was rendered does not have a law setting the amount for payment rendered by an out-of-network provider, then the insurer shall issue a payment or deny payment to the out-of-network provider within 30 days of the provider submitting its bill. *Id.* § 300gg-111(a)(1)(C)(iv), (b)(1)(C).
>
> 3. If the out-of-network provider is not satisfied with the insurer's payment amount or claim denial, then the provider may initiate a 30-day negotiation period with the insurer. *Id.* § 300gg-111(c)(1)(A).
>
> 4. If the negotiations between the insurer and the out-of-network provider do not resolve the dispute, the parties may engage in an Independent Dispute Resolution ("IDR") process. *Id.* § 300gg-111(c)(1)(B).

The determination by a certified IDR entity is binding on the parties and generally not subject to judicial review. *Id.* § 300gg-111(c)(5)(E)(i)(II).

The IDR process requires the out-of-network provider and the insurer to submit proposed payment amounts accompanied by an explanation for the IDR entity's consideration. *Id.* § 300ggg-111(c)(5). The Act requires IDR entities to consider multiple factors. For emergency health service providers, they must consider "the qualifying payment amount" ("QPA"), which is the "median of the contracted rates recognized by the" insurer as of January 31, 2019 in the same insurance market for the "same or a similar item or service that is provided by a provider in the same or similar specialty and provided in the geographic region," increased by inflation over the base year. *See id.* §§ 300gg-111(a)(3)(E)(i), (c)(5)(C)(i)(I). For ambulance service providers, the QPA is the "median of the contracted rates recognized by the" insurer as of January 31, 2019 in the same insurance market "for items or services that are comparable to the qualified IDR air ambulance service and that are furnished in the same geographic region[.]" *Id.* §§ 300gg-112(b)(5)(C)(i)(I); *see id.* §§ 300gg-111(a)(3)(E)(i).

## B. Interim Final Rules Parts I & II

On July 13, 2021, the Departments published the first interim rule, IFR Part I, which specified that cost-sharing amounts for services rendered by out-of-network emergency facilities or services rendered by out-of-network providers must be calculated based on one of the following amounts: (1) an amount determined by an applicable All-Payer Model Agreement under section 1115A of the Social Security Act; (2) if there is no such applicable All-Payer Model Agreement, an amount determined by a specified state law; or (3) if there is no such applicable All-Payer Model Agreement or specified state law, the lesser of the billed charge or the plan's or issuer's" QPA. *Requirements Related to Surprise Billing; Part I*, 86 Fed. Reg. 36872, 36874 (July 13, 2021). Also, under IFR Part I, "[c]ost-sharing amounts for air ambulance services provided by [out-of-network] providers must be calculated using the lesser of the billed charge or the QPA, and the cost-sharing requirement that would apply if such services were provided by a

participating provider." *Id.*

On October 7, 2021, the Departments published the second interim final rule, IFR Part II, which specified rules for the IDR process. *Requirements Related to Surprise Billing; Part II*, 86 Fed. Reg. 55,980 (Oct. 7, 2021). The rule became effective immediately after publication. *Id.* IFR Part II provided specific guidelines for out-of-network facilities, out-of-network service providers, and insurers to participate in the IDR process in order to "reduce the use of the Federal IDR process over time and the associated administrative fees born by the parties, while providing equitable and clear standards for when payment amounts may deviate from the QPA, as appropriate." *Id.* Another aspect of the IFR Part II regime is what Plaintiffs describe as the QPA Presumption, which "command[s] that the IDR entity presume that the QPA is the correct rate." [R. 1 at ¶ 83]. The implication of the QPA Presumption is that the parties (providers and insurers) must submit "credible information . . . [that] clearly demonstrates that the [QPA] is materially different from the appropriate out-of-network rate[.]" 45 C.F.R. § 149.510(c)(4)(ii)(A). This regulation would require the IDR entity to provide a written explanation of why it chose to deviate from the QPA. *Id.* § 149.150(c)(4)(vi)(B).

Plaintiffs allege that they were adversely impacted by Defendants' promulgation of the interim final rules. Prior to the implementation of the NSA, PHI states it "had the right to seek reasonable compensation from the patient directly" and that the right, although rarely invoked, "was a powerful source of leverage" when negotiating the payment of out-of-network claims from insurance providers. [R. 1 at ¶ 46]. Likewise, EMpact states that, prior to the NSA's implementation, it had the right to pursue a cause of action under Kentucky state law to recover payment for the emergency medical services it renders. [*Id.* at ¶ 54]. Moreover, EMpact, too, leveraged its rights to pursue payment when negotiating payment for out-of-network claims with commercial health plans and insurers. [*Id.* at ¶ 55]. Plaintiffs contend that the NSA replaced the

prior scheme by its implementation of the IDR process. [*Id* at ¶¶ 56–57]. For example, IFR Part I & Part II directly impacted the implementation of the NSA and the IDR process. [*Id.* at ¶¶ 62–64].

The Complaint advances ten counts alleging that the interim rules are unlawful and were unlawfully implemented. In Count I, Plaintiffs argue that Departments failed to provide public notice of the proposed regulations or an opportunity for comment, violating the Administrative Procedure Act (APA). [R. 1 ¶¶ 170–81]; *see also* [*Id.* at ¶¶ 68, 70, 73]. In Count II, Plaintiffs argue that the QPA Presumption is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. [*Id.* at ¶ 185] (citing 5 U.S.C. § 706(2)(A), (C)). Counts III–VI allege that certain regulations should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. [*Id.* at ¶¶ 190–98]. As to Counts VII and VIII, PHI argues that the regulation that includes hospital contracted rates in the QPA for independent air ambulance providers and the regulation defining "cost sharing" violates the APA. [*Id.* at ¶¶ 218–34]. Finally, in Counts IX and X, PHI alleges that the regulations and the NSA violate the Due Process Clause and Takings Clause of the United States Constitution. [*Id.* at ¶¶ 235–68]. Plaintiffs seek various forms of declaratory and injunctive relief; a judgment declaring that IDR entities must make determinations without regard to the regulations; and a judgment declaring IDR decisions applying the challenged regulations must be voided, reopened, and restarted without regard to the regulations. [*Id.* at pg. 78].

## C. Motion to Transfer

On July 1, 2022, Defendants filed the instant Motion to Transfer Venue. [R. 21]. They argue that venue is improper because PHI is pursuing claims identical to those alleged in the Complaint in a case filed earlier in the District of Columbia. [*Id.* pg. 1]. According to the Defendants, the first case is at an "advanced stage" where the parties were already briefing cross

motions for summary judgment. [*Id.*]. Thus, "[t]o prevent the unnecessary expenditure of judicial resources, avoid wasteful and duplicative litigation, and avert the possibility of inconsistent judgments," Defendants move the Court to transfer this action under the "first-to-file" rule to the United States District Court for the District of Columbia.

The District of Columbia case was filed on November 16, 2021. *Ass'n of Air Med. Servs. V. HHS, et al.*, Civil Action No. 1:21-cv-03031-RJL (D.D.C. 2021) (hereinafter, *AAMS*), [R. 1].[1] The lead plaintiff in that case is the Association of Air Medical Services ("AAMS"), which is "the international trade association that represents over 93% of air ambulance providers in the United States." [*Id.* at ¶ 20]. The Complaint states,

> Together, AAMS's 300 members operate more than 1,000 helicopter air ambulances and 200 fixed wing air ambulance services across the United States. AAMS represents every emergency air ambulance care model, including hospital-based aircraft, independent aircraft at bases in rural areas far from hospitals, and many hybrid variations. AAMS represents and advocates on behalf of its members in a variety of forums. As part of that mission, AAMS brings litigation, including the instant action, on behalf of its members to challenge government action that will harm them.

[*Id.*]. Further, AAMS elaborates that the interim final rules harm its members, including PHI. [*Id.* at ¶ 121].

Defendants contend that, because Plaintiffs in this case assert challenges to the same interim final rules, the cases should be consolidated under the first-to-file rule. Indeed, AAMS's two-count Complaint alleges that the interim final rules promulgated by Defendants—the same Defendants in the instant action—are unlawful. [*Id.* at ¶¶ 94–118]. Count I of the Complaint pertains to IFR Part II, and Count II pertains to IFR Part I. However, on September 30, 2022, the parties jointly stipulated to dismissing Count I. *Id.*, [R. 79]. Thus, the only claim remaining in the

---

[1] A second case was filed in the District of Columbia on December 9, 2021 and asserts similar claims: *Ass'n of Air Med. Servs. Am. Med. Ass'n v. HHS*, Civil Action No. 1:21-cv-03231-RJL (D.D.C. 2021). This case was consolidated with the *AAMS* on February 2, 2022. However, since the cases were consolidated, the parties jointly stipulated to dismissal of the claims asserted in the second case. *AAMS*, [R. 76].

District of Columbia action is the claim challenging IFR Part I.  *Id.*, [R. 1 at pg. 37].  In the instant action, and by contrast, Plaintiffs allege ten counts for relief.

### D. Final Rule

After Defendants' Motion to Transfer was fully briefed, in August 2022, the Departments published a finalized rule containing certain provisions of the NSA regulations (the "Final Rule"). *Requirements Related to Surprise Billing*, 87 Fed. Reg. 52,618 (Aug. 26, 2022).  While some language was removed pursuant to a ruling in the Eastern District of Texas, *Tex. Med. Ass'n v. United States HHS*, 587 F. Supp. 3d 528 (E.D. Tex. 2022), *appeal dismissed by Tex. Med. Ass'n v. United States HHS*, No. 22-40264, 2022 U.S. App. LEXIS 30150 (5th Cir. Oct. 24, 2022), "the Final Rule still limits the discretion of arbitrators in determining the payment amount." *Tex. Med. Ass'n v. United States HHS*, No. 6:22-cv-372-JDK, 2023 U.S. Dist. LEXIS 19526, at *14 (E.D. Tex. Feb. 6, 2023).

Defendants provided Notice that the Final Rule was in effect on August 26, 2022.  [R. 28]. In Response, Plaintiffs stated that the revised regulations "will result in relevant changes both to this lawsuit and to the District of Columbia case that features prominently in Defendants' pending motion to transfer[.]"  [R. 29 at pg. 1].  For that reason, Plaintiffs advised the Court that they "intend to amend their Complaint" which will likely alter the "similarity of issues or claims at stake" among this case and the District of Columbia case.  [*Id.*].  Accordingly, "it would be appropriate for this Court to delay any decision on Defendants' motion to transfer until Plaintiffs have amended their complaint[.]"  [*Id.*].

Plaintiffs stated their intent to file an amended complaint consistent with the Final Rule on September 1, 2022.  [*Id.*].  To date, the Plaintiffs have not sought leave to amend their Complaint. Therefore, the Court shall consider the Motion to Transfer based on the Complaint available to it and the pleadings in the District of Columbia matter.

## II. DISCUSSION

Defendants' argue that this action should be transferred to the District of Columbia, where *AAMS* is currently being litigated, and that their motion turns on the applicability of the first-to-file rule. The first-to-file rule is a well-established doctrine in this district that "encourages comity among federal courts of equal rank." *Certified Restoration Dry Cleaning Net., L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) (quoting *AmSouth Bank v. Dale*, 386 F.3d 763, 791 n.8 (6th Cir. 2004) (citation omitted)). It applies when there are two actions involving nearly identical parties and issues, and generally requires that the court in which the first suit was filed to proceed to judgment. *Abercrombie & Fitch Co. v. Ace European Grp., Ltd.*, Civil Action No. 2:11-cv-1114, 2012 U.S. Dist. LEXIS 102008, at *7–8 (S.D. Ohio July 23, 2012) (quoting *Zide Sport Shop of Ohio v. Ed. Tobergate Assoc., Inc.*, 16 F. App'x 433, 437 (6th Cir. 2001)). The rule "also conserves judicial resources by minimizing duplicative or piecemeal litigation, and protects the parties and the courts from the possibility of conflicting results." *Baatz v. Columbia Gas Transmission, LLC*, 814 F.3d 785, 789 (6th Cir. 2016) (citing *EEOC v. Univ. of Pa.*, 850 F.2d 969, 977 (3d Cir. 1988)).

The Sixth Circuit has recognized three salient factors for conducting a first-to-file analysis: "(1) the chronology of events, (2) the similarity of the parties involved, and (3) the similarity of the issues or claims at stake." *Baatz*, 814 F.3d at 789. In addition to such factors, district courts must also consider equitable consequences of transfer, such as forum shopping, bad faith, or other inequitable conduct. *Id.* The decision of whether to apply the first-to-file rule is within the discretion of the district court, and the court should "dispense with the first-to-file rule where equity so demands." *Zide Sport Shop of Ohio, Inc. v. Ed Tobergte Assocs., Inc.*, 16 F. App'x 433, 437 (6th Cir. 2001). "[D]eclining to apply the first-to-file rule [when the three factors are

met] should be done rarely." *Baatz*, 814 F.3d at 793.[2]

The Court will address the three relevant factors to determine whether the first-to-file rule is applicable. Then, the Court will address whether equitable considerations counsel against application of the first-to-file rule.

**1. Chronology of Events**

"The chronology of events requires a comparison of when the relevant complaints were filed." *Boling v. Prospect Funding Holdings*, LLC, 771 F. App'x 562, 571 (6th Cir. 2019) (citing *Baatz*, 814 F.3d at 790. The ultimate question here is "which of the two overlapping cases was filed first." *Brown v. Intelemedia Communs.*, No. 2:18-cv-2018-JPM-tmp, 2018 U.S. Dist. LEXIS 244971, at *6 (W.D. Tenn. July 11, 2018) (quoting *Baatz*, 814 F.3d at 790). Here, Plaintiffs filed their Complaint on April 29, 2022. [R. 1]. The *AAMS* Complaint was filed on November 16, 2021. Clearly, between the two cases, the *AAMS* case was filed first.

The Plaintiffs do not dispute that *AAMS* was filed before the instant action. They do argue, however, that *AAMS* is not the *first* action raising the issues arising out of Defendants' implementation of interim final rules. Rather, they indicate that the first action raising similar claims as those in this case was filed in in the Eastern District of Texas, *Tex. Med. Ass'n v. United States HHS*, 587 F. Supp. 3d 528 (E.D. Tex. 2022) (hereinafter *TMA* ). There, the Texas Medical Association and co-plaintiffs filed their Complaint on October 28, 2021, challenging IFR Part II, arguing that it improperly requires arbitrators to "give outsized weight" to a single statutory factor, the QPA, in conflict with the Act. *TMA*, 587 F. Supp. 3d at 536. The court ultimately granted summary judgment in favor of the Texas Medical Association, finding that the Defendants had

---

[2] The Sixth Circuit has indicated that a district court applying the first-to-file rule may "stay the suit before it," "allow both suits to proceed," "enjoin the parties from proceeding in the other suit," or dismiss the suit entirely. *Baatz*, 814 F.3d at 793. Stressing "the need for the district court to have discretion in managing its docket," the Sixth Circuit expressly stated that it "cannot anticipate every situation involving the first-to-file rule that may arise, and will not limit the district courts' available options." *Id.*

improperly implemented parts of IFR Part II and that IFR Part II conflicted with unambiguous terms in the Act. *Id.* at 549. Because of the similarities of that action to this one, and the fact that *TMA* was filed *first*, Plaintiffs argue that transfer to the District of Columbia would actually be improper under the first-to-file rule.

The Eastern District of Texas echoed Plaintiffs' logic in *LifeNet, Inc. v. United States HHS*, No. 6:22-cv-162-JDK, 2022 U.S. Dist. LEXIS 132693 (E.D. Tex. July 26, 2022), where the court denied the defendants' (the same Defendants in the case before this Court) Motion to Transfer. Just as here, the action involved a plaintiff who is an air ambulance provider challenging IFR Part I. Also, just as here, the *LifePoint* defendants moved to transfer the action to the District of Columbia under the first-to-file rule because the *AAMS* action was filed first. Even though *TMA* had already reached final judgment, the Eastern District of Texas rejected defendants' argument stating that "the [first-to-file] rule does not apply because the first-filed case is *TMA*, not [*AAMS*]." *LifeNet*, 2022 U.S. Dist. LEXIS 132693, at *10. The *LifeNet* court, accordingly, denied defendants' motion to transfer.

As similar circumstances are present here, the Court is persuaded by *LifeNet*. If the first-to-file rule meant to "give[] way to 'considerations of judicial and litigant economy, and the just and effective disposition of disputes[,]'" *Drew Techs., Inc. v. Robert Bosch, L.L.C.*, No. 11-15068, 2012 U.S. Dist. LEXIS 11489, at *16 (E.D. Mich. Jan. 31, 2012), it does not follow that this action should be consolidated with a related action which was not even the first of its kind. Based on chronology alone, *AAMS* was not the first case filed raising claims similar to those in this action. Therefore, for chronology of events factor weighs against applying the first-to-file rule.

**2. Similarity of Parties Involved**

Next, the Court must consider the similarity of the parties involved in this case and the

parties to *AAMS*. Examining the similarity-of-parties factor, the Court considers whether "the parties in the two actions 'substantial[ly] overlap,' even if they are not perfectly identical." *Baatz*, 814 F.3d at 790 (quoting *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950–51 (5th Cir. 1997)). Setting aside the parties' arguments on this factor, it is noteworthy that while the defendants in each action are identical, there is no overlap between the plaintiffs. Currently, the parties to the District of Columbia action include AAMS, the American Medical Association, and three individual medical doctors. In this case, there are two plaintiffs: PHI and EMpact.

Defendants argue that there is substantial overlap between the parties in both actions because AAMS is a trade association of which PHI is a member. Moreover, Defendants claim (without offering evidence) that PHI has "actively participated with [AAMS]" in the District of Columbia action, and that AAMS has rested its claim of standing upon PHI's injury under the challenged rules. [R. 21 at pg. 10]. Upon review of the record of the District of Columbia action, the Court only notes that PHI's Chief Financial Officer, Grayson Foster, offered a Declaration describing the impact of the interim final rules on PHI's operations. *See AAMS*, Civil Action No. 1:21-cv-03031-RJL, [R. 1-5]. Otherwise, AAMS has "300 member[s] operat[ing] more than 1,000 helicopter air ambulances and 200 fixed wing air ambulance services across the United States." *Id.*, [R. 1 at ¶ 20].

Although Defendants are correct that AAMS does hinge its standing upon the injuries of its members, including PHI, that is not dispositive when deciding whether there is substantial overlap of parties. Courts in this circuit have generally only found a substantial overlap among associated, but not identical, parties when there is "privity or affiliation between/among" those parties. *Elite Physicians Servs., LLC v. Citicorp Credit Servs.*, Inc., No. 1:06-CV-86, 2007 U.S. Dist. LEXIS 26954, at *9 (E.D. Tenn. Apr. 11, 2007). For instance, another court in this circuit applied the first-to-file rule where the same plaintiff sued (1) a defendant individually for

infringing upon his patent, and (2) two car manufacturers for infringing upon his patent by purchasing the allegedly infringing patent from the individual defendant. *Hayes Lemmerz Int'l, Inc. v. Epilogics Grp.*, No. 03-CV-70181-DT, 2006 U.S. Dist. LEXIS 62915, at *6 (E.D. Mich. Sep. 5, 2006). There, the Court specifically noted that the individual defendant and car manufacturers were not only joint tortfeasors, but the individual defendant was "*contractually obligated* to defend and indemnify" the car manufacturers for losses relating to any patent infringement lawsuit. *Id.* at *6 n.2 (emphasis added). Another district court ruled that the first-to-file rule applied when the defendant was the parent company in one case, while the defendant in the second case was its subsidiary. *Supervalu Inc. v. Exec. Dev. Sys.*, No. CV-06-329-S-BLW, 2007 U.S. Dist. LEXIS 3141, at *4 (D. Idaho Jan. 12, 2007).

That said, in the Sixth Circuit, it is well established that, in applying the first-to-file rules in class actions, the putative classes need not be identical. *See e.g.*, *Baatz*, 814 F.3d at 791. But even where there exists a relationship between parties in two similar lawsuits, courts continue to define the line between "substantially similar" and "not similar enough." Take, for example, franchises. While several courts have applied the first-to-file rule in the context of franchisor-franchisee relationships, a court in this circuit held that the first-to-file rule did not apply because the allegations in the case before it were "not about the assignment of legal rights such that the franchisee's liability depends on the rights of the franchisor." *Honaker v. Wright Bros. Pizza*, No. 2:18-cv-1528, 2019 U.S. Dist. LEXIS 154647, at *9 (S.D. Ohio Sep. 11, 2019) (collecting and distinguishing cases). Thus, even where there clearly exists a relationship among parties, courts do limit the significance of such relationships in a first-to-file analysis under some circumstances.

Placing such a limit is appropriate in this case. The Defendants have not identified any authority which suggests that mere membership of a trade organization creates privity between the member and the organization, or otherwise creates a fiduciary or contractual obligation between

them. By Defendants' logic, some 300 providers are effectively deprived of the ability to individually bring similar claims in a forum of convenience because they are members of AAMS. Absent some showing that there is an agency or fiduciary relationship between PHI and AAMS, the Court declines to find that the parties are "substantially similar" for purposes of a first-to-file analysis.

### 3. Similarity of the Issues

The third factor the Court must consider the similarity of the issues involved in this action and the District of Columbia action. "Just as with the similarity of the parties factor, the issues need only to substantially overlap in order to apply the first-to-file rule." *Baatz*, 814 F.3d at 791. One action must be "materially on all fours with the other" action, and the issues at stake "must have such an identity that a determination in one action leaves little or nothing to be determined in the other." *Smith v. SEC*, 129 F.3d 356, 361 (6th Cir. 1997) (quoting *Congress Credit Corp. v. AJC Int'l, Inc.*, 42 F.3d 686, 689 (1st Cir. 1994)).

In one unpublished opinion, the Sixth Circuit outlined its reasoning for finding a substantial similarity among the issues, thus meriting the application of the first-to-file rule: (1) the complaint in both cases both were drafted by the same attorney and used identical language throughout both filings; (2) both complaints alleged the same corporate defendant contracted with the plaintiffs, breached the company's duty to act in good faith, and sought the same damages and attorneys' fees; and (3) the only material difference between the two complaints was that the suit filed in Kentucky also alleged violations of Kentucky statutes. *Heyman v. Lincoln Nat'l Life Ins. Co.*, 781 F. App'x 463, 477 (6th Cir. 2019). Ultimately, "[a]lthough not identical in all respects[,]" the court nonetheless found a substantial overlap of issues and claims. *Id.* at 478.

In this case, the current Complaint advances ten counts alleging that the interim rules are unlawful and were unlawfully implemented. In Count I, Plaintiffs argue that the interim rules

should be set aside because the Departments failed to provide public notice of the proposed regulations or an opportunity for comment, in contravention of the APA, nor did they provide good cause to dispense with the notice-and-comment period. [R. 1 ¶¶ 170–81]; *see also* [*Id.* at ¶¶ 68, 70, 73]. In Count II, Plaintiffs argue that the QPA Presumption, as set forth in six separate regulations enacted pursuant to IFR Part II, should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. [*Id.* at ¶ 185] (citing 5 U.S.C. § 706(2)(A), (C)). As to Counts III–VI, Plaintiffs argue that certain regulations should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. [*Id.* at ¶¶ 190–98] (regulation prescribing information that must be provided to IDR entity, 45 C.F.R. § 149.140(d)(2)); [*Id.* at ¶¶ 199–206] (regulation governing which rates are included in IDR entity's QPA calculation, 45 C.F.R. § 149.140(b)(1)); [*Id.* at ¶¶ 207–211] (regulation prescribing geographic regions used to determine QPA, 45 C.F.R. § 149.140(a)(7)); [*Id.* at ¶¶ 212–17] (regulation excluding case-specific agreements from QPA calculation, 45 C.F.R. § 149.140(a)(1)). As to Counts VII and VIII, PHI argues that the regulation that includes hospital contracted rates in the QPA for independent air ambulance providers and the regulation defining "cost sharing" for air ambulance services should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA. [*Id.* at ¶¶ 218–34]. Finally, in Counts IX and X, PHI argues that the regulations and the NSA violate the Due Process Clause and Takings Clause of the United States Constitution. [*Id.* at ¶¶ 235–68]. Plaintiffs seek various forms of declaratory relief, an injunction setting aside the challenged regulations and preventing future enforcement; a judgment declaring that IDR entities must make determinations without regard to the regulations; and a judgment declaring IDR decisions applying the challenged regulations must be voided, reopened, and restarted without regard to the regulations. [*Id.* at pg. 78].

By contrast, AAMS' <u>two-count</u> Complaint alleges that the interim final rules promulgated by defendants—the same Defendants in the instant action—are unlawful. *AAMS*, [R. 1 at ¶¶ 94–118]. Count I of the Complaint pertains to IFR Part II, and Count II pertains to IFR Part I. However, on September 30, 2022, the parties jointly stipulated to dismissing Count I and its challenge to IFR Part II. *Id.*, [R. 79]. Thus, the only claim remaining in the District of Columbia action is the claim challenging IFR Part I as "arbitrary, capricious, and contrary to law derivation of QPA." *Id.*, [R. 1 at pg. 37].

As the pleadings in each case stand, the Court is unpersuaded that a judgment in the District of Columbia action would leave "little or nothing" to be determined in this action. Also relevant to this factor is that the Complaints do not contain identical language, nor were they drafted by the same attorney or group of attorneys. Certainly, both cases invoke similar challenges against at least one of the same interim final rules—but, at this juncture, there are many claims that would be resolved in this matter that would not be resolved in the District of Columbia matter. Thus, the third factor weighs against applying the first-to-file rule.

**4. Equitable Considerations**

Finally, while the above three factors are not satisfied in this case, the Court "must also evaluate whether there are any equitable concerns" which would merit applying the first-to-file rule. *Baatz*, LLC, 814 F.3d at 792. In doing so, courts should consider "evidence of 'inequitable conduct, bad faith, anticipatory suits, [or] forum shopping[.]'" *Honaker v. Wright Bros. Pizza*, No. 2:18-cv-1528, 2019 U.S. Dist. LEXIS 154647, at *5 (S.D. Ohio Sep. 11, 2019) (quoting *Baatz*, 814 F.3d at 789); *see also Weisfeld v. Fed. Express Corp.*, No. 2:22-cv-2133-JPM-tmp, 2022 U.S. Dist. LEXIS 192365, at *12 (W.D. Tenn. Oct. 21, 2022) (collecting cases that declined to apply first-to-file rule based on equitable considerations).

Neither Plaintiffs nor Defendants aver inequitable conduct, nor do they assert bad faith

against one another. Further, the Court does not perceive that Plaintiffs engaged in forum shopping, as they chose a venue in the state *and* district in which they are based. *Cf. Segars v. Humana Inc.*, Civil Action No. 3:21-cv-342-RGJ, 2022 U.S. Dist. LEXIS 77273, at *5 (W.D. Ky. Apr. 28, 2022) (quoting *Employees Ret. Sys. v. Jones*, No. 2:20-CV-04813, 2020 U.S. Dist. LEXIS 240008, 2020 WL 7487839, at *3 (S.D. Ohio Dec. 21, 2020)) ("Forum shopping occurs 'when a litigant selects a forum with only a slight connection to the factual circumstances of his action, or where forum shopping alone motivated the choice.'"). Although Defendants are correct that *AAMS* is at a later stage of litigation, Plaintiffs in this action advance claims that would not be resolved upon *AAMS* reaching judgment. As such, the Court does not identify equitable reasons for applying the first-to-file rule.

### III. CONCLUSION

As none of the three first-to-file factors support applying the first-to-file rule, and because none of the equitable considerations apply, the Court will exercise its discretion and deny Defendants' Motion to Transfer pursuant to the first-to-file rule. For the reasons stated herein, and the Court being otherwise sufficiently advised,

IT IS ORDERED that:

1. Defendants' Motion to Transfer Venue [R. 21] is DENIED;

2. Defendants' Motion for Extension of Time to file an Answer [R. 22] is GRANTED, and the deadline to file a responsive pleading shall be set by subsequent Order;

3. Within 30 days of entry of this Order, the Plaintiffs shall file a motion seeking leave to amend the Complaint or, alternatively, file a Status Report indicating that it will not be seeking leave to amend the Complaint;

Signed February 27, 2023.



Signed By:
*Edward B. Atkins*  $\mathcal{EBA}$
United States Magistrate Judge